UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

AUDREE PACHURA,

                Plaintiff,

-against-                                  6:21-CV-0316 (LEK/ATB)

LLOYD J. AUSTIN, III, Secretary,
Department of Defense,

                Defendant.

## MEMORANDUM-DECISION AND ORDER

**I. INTRODUCTION**

Audree Pachura ("Plaintiff") brings this action against Defense Secretary Lloyd J. Austin ("Defendant"), alleging retaliation and hostile work environment claims under Title VII. Dkt. No. 1 ("Complaint"). Defendant filed a motion to dismiss, Dkt. No. 13, which was rendered moot when Plaintiff filed an amended complaint, Dkt. No. 22 ("Amended Complaint"). Defendant again filed a motion to dismiss, Dkt. No. 25 ("Motion" or "Motion to Dismiss"), Plaintiff filed a response, Dkt. No. 27 ("Response"), and Defendant filed a reply, Dkt. No. 32 ("Reply"). For the reasons that follow, the Motion is denied.

**II. BACKGROUND**

The following factual allegations are assumed to be true in evaluating the Motion to Dismiss. See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 76 (2d Cir. 2015).

In June 2018, Plaintiff was hired as a GS-4 Pathways Intern by the Defense Finance and Accounting Service ("DFAS"), a division of the Department of Defense. Am. Compl. at 2–3. Plaintiff worked out of DFAS's office in Rome, New York. Id. at 3. During the time of

Plaintiff's employment, David Magnano ("Magnano") was Plaintiff's co-worker and the Chief Steward of American Federation Government Employees ("AFGE") Local 201. Id.

### A. Harassment Allegations

Between July 2019 and October 2019, Magnano frequently sexually harassed Plaintiff, both in person and via Facebook Messenger. Id. at 5–8. In his many Facebook messages, Magnano shared sexual content about himself, including sending a photograph of his genitals, descriptions of working from home while nude and masturbating, and statements that he was sexually aroused by thinking of Plaintiff, that he imagined having sex with her, and that he had sex dreams about her. Id. Magnano also inquired about Plaintiff, requesting pictures of her tattoos, asking about her preferred sexual positions, and asking her if she "goes commando." Id. On numerous occasions, Magnano requested to meet with Plaintiff in private, including asking to meet in the Union Office so he could see her tattoos, requesting to meet in private so that she could teach him to hula hoop, stating that they should take a "good long ride in the car," asking Plaintiff to come check on him while he was taking a nap and practicing his hip movements, and asking her to join him in the closet. Id. On several occasions Magnano also stated his intention or desire to crawl under Plaintiff's desk and look up her dress. Id. For a more complete chronicle of Magnano's inappropriate behavior, see Plaintiff's Amended Complaint at 5–8.

Plaintiff often ignored Magnano's messages, and on several occasions rebuffed his advances, telling him on August 6, 2019, that she had a boyfriend, on August 8, 2019, that she would not join him in private to reveal her tattoos because she was a professional, and on August 9, 2019, that she would not have a relationship with him. Id. at 5–6. When Magnano persisted, Plaintiff told him to stop all conversation with her, a request which he ignored. Id. at 6. When

Plaintiff refused to respond to Magnano's messages he would often contact her via her work computer or would walk over to her desk to ask why she had failed to respond. Id. at 9.

On September 12, 2019, after nearly two months of harassment, Plaintiff received a message asking what she was wearing, and, while thinking about how to respond, suffered a stress-induced seizure, which required a visit to the emergency room. Id. at 7–8. Plaintiff's seizure resulted in severe aggravation of her previously mild herniation. Id. at 9. Following Plaintiff's seizure, Magnano's harassment continued, including further requests to engage in sexual activity. Id. at 8. On October 9, 2019, Plaintiff told Magnano that he needed to stop contacting her or she would go to HR. Id. On or around October 14, 2019, Plaintiff went on unpaid leave due to severe spinal pain. Id. at 9.

### B. Reporting of Harassment and Retaliation

On November 20, 2019, Plaintiff contacted Bill Larson, a specialist in Defendant's human resources department, and informed him about Magnano's sexual harassment. Id. On the same day, Larson and Human Resources Liaison Thomas Rahn called Plaintiff to discuss her complaint. Id. Larson and Rahn told Plaintiff that they would conduct an investigation and hand it over to the EEO. Id. They informed Plaintiff there was nothing further she could do. Id. At the conclusion of the conversation, an appointment between Plaintiff and her director, Lisa Iselo, was scheduled for November 26, 2019. Id. at 10. Rahn maintains that he told Plaintiff to contact the EEO after meeting with Iselo. Id. Plaintiff believes that Larson intentionally mislead Plaintiff to not file her EEO complaint until after November 26, 2019, because the deadline to file an EEO complaint was November 23, 2019. Id.

On November 26, 2019, Iselo interviewed Plaintiff, and Plaintiff described the injuries she had sustained as a result of the sexual harassment. Id. Iselo stated that nothing could be done

3

until the investigation was complete. Id. Based on her conversations with Larson, Rahn, and Iselo, Plaintiff did not believe she needed to file a complaint with EEO and did not do so until several months later. See id. at 10, 13.

On December 5, 2019, Magnano's girlfriend sent Plaintiff harassing messages through a third party. Id. at 11. Plaintiff believes that Magnano was continuing his harassment through his girlfriend. Id.

On December 10, 2019, a no contact order was signed. Id. Plaintiff subsequently typed up and submitted to DFAS a document providing additional detail about incidents involving Magnano. Id.

On January 8, 2020, Plaintiff contacted Iselo about returning to work. Id. Iselo approved the request and asked Plaintiff to contact Human Resources. Id. Plaintiff was given a return date of February 18, 2020.

On January 13, 2020, Plaintiff interviewed as a GS-09 applicant for a Grade 7/9/11 accountant position. Id. at 12. Plaintiff received a perfect interview score of 25 for the position. Id. The hiring officials were made aware of Plaintiff's sexual harassment report around mid-February, 2020[1], and Plaintiff was denied the position on March 6, 2020. Id. The position was ultimately given to an applicant who received a score of 19. Id.

---

[1] Plaintiff bases this assertion on several factors. First, she notes that "Plaintiff's hiring official Ms. Kristen Szarek was made Plaintiff's Branch Chief after Plaintiff was transferred to allegedly protect her from the harasser on or around 2/5/20. The 2/5/20 transfer was initiated by HR reps Thomas Rhan [sic] & Bill Larson, the same HR reps who were also initially involved in the sexual harassment reporting process in November 2019. Thus, hiring official Szarek became the Plaintiff's supervisor with access to Plaintiff's transfer records including the reason for the transfer i.e., sexual harassment before Szarek denied Plaintiff the Position she applied for." Am. Compl. at 12. Next Plaintiff notes that the individuals involved in approving the budget for the hiring official were made aware of Plaintiff's protected activity in mid-February. Id. at 12–13. Finally, Plaintiff notes that Szarek told Plaintiff that she was unsure why Plaintiff was denied the

4

On January 23, 2020, Plaintiff was asked by Iselo to "respond to feedback from Magnano's reporting that Plaintiff and Magnano had spoken about sexual positions and being naked." Id. at 13.

On February 11, 2020, Plaintiff left a voicemail with Larson reminding him of her request to return to work. Id. Larson responded that Plaintiff could return to work, but that Iselo would contact her. Id.

On February 12, 2020, Plaintiff contacted the EEO to inquire about her Sexual Harassment claim. Id. She was informed that Defendant had not submitted the claim for her, and that she was supposed to have submitted her claim within 45 days of the last incidence of harassment. Id. EEO allowed Plaintiff to file a complaint. Id.

On the same day, Plaintiff received a message from Iselo stating that Plaintiff would be transferred to another department in another building. Id. at 14. On February 15, 2020, Plaintiff was told by her new Branch Chief, Kristen Szarek, that she intended to keep Plaintiff as an intern with the intent of hiring her for the position she applied to in January. Id.

On February 18, 2020, Plaintiff returned to work and was placed on the same floor and in the vicinity of Magnano, such that Magnano had to pass Plaintiff's desk to exit the building. Id. Plaintiff's relocation closer to Magnano was the result of a request by Larsen, who initiated the transfer of Plaintiff's location and department. Id. Larson's request to move Plaintiff close to Magnano was prompted, reviewed, and approved by Iselo. Id. at 15. Following this transfer, Plaintiff's workspace was never moved away from Magnano's. Id. Magnano was never

---

position given her understanding that there was hiring authority saved to hire Plaintiff for a GS-09 position. Id. at 13.

5

meaningfully reprimanded nor was any action taken to prevent him from harassing other employees. Id.

### C. Allegations of Defendant Knowledge

Plaintiff alleges that Defendant knew or should have known that Plaintiff was sexually harassed by Magnano because of the following circumstances.

Prior to and during the time that he was harassing Plaintiff, Magnano was dating an employee who worked under him, and Plaintiff's employer was aware of this relationship. Id. at 4.

Plaintiff informed Iselo that she was receiving inappropriate comments about her clothing, but Iselo failed to take action. Id.

Magnano admitted to Plaintiff that he was sexually harassing other female co-workers including an employee named Crystal who subsequently left the employer. Id. Iselo conducted an interview with Crystal regarding the appropriateness of Magnano's conduct, and, during her November 26, 2019, interview with Plaintiff, Iselo acknowledged that she questioned Magnano's intentions with regard to Crystal. Id.

Kristen Szarek, the Branch Chief of the area to which Plaintiff was transferred, admitted in late February or early March that she had previously had a sexual harassment issue with an individual in the AFGE Union. Id. at 3. Regional Union Representative Theresa Impink also stated that sexual harassment was a problem at the local AFGE office and described it as a "boys club." Id. at 3.

### III. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662,

678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.

"In considering a motion under Fed. R. Civ. P. 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, [a] district court is normally required to look only to the allegations on the face of the complaint." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). However, in certain limited circumstances, a court may consider documents besides the pleadings in deciding a motion to dismiss. For instance, "documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." Beauvoir v. Israel, 794 F.3d 244, 248 n.4 (2d Cir. 2015) (internal quotation marks omitted).

## IV. DISCUSSION

### A. Plaintiff's Affidavit and Exhibits

As noted above, in evaluating a motion to dismiss, the Court typically considers a plaintiff's complaint and any documents attached as exhibits or incorporated by reference to the

7

extent such exhibits are relevant to the incidents described in the complaint. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

Here, Plaintiff attached her EEO Final Agency Decision, including her responses to its findings, as an exhibit to her original complaint. Dkt. No. 1-1. Plaintiff failed to attach this document to her Amended Complaint, but referenced it in the text of the Amended Complaint, incorrectly stating that it was attached as an exhibit. Am. Compl. at 2. In Defendant's Motion to Dismiss, Defendant references the Final Agency Decision and notes that Plaintiff likely intended to incorporate the exhibit into her Amended Complaint. Mot. at 1. Subsequently, Plaintiff filed an affidavit in response to the Motion to Dismiss, Dkt. No. 28, which included the same annotated Final Agency Decision as an exhibit, Dkt. No. 28-1. Plaintiff also included a second exhibit, a declaration by Mathew Browne. Dkt. No. 28-2. In his Reply, Defendant argues that Plaintiff's affidavit must be stricken. Reply at 2.

The Court construes Dkt. No. 1-1 as incorporated by reference into Plaintiff's Amended Complaint. In ruling on Defendant's Motion to Dismiss, the Court finds it unnecessary to consider Dkt. No. 28 and Dkt. No. 28-2 and thus need not determine whether they must be stricken.

**B. Hostile Work Environment**

Defendant does not contest Plaintiff's allegation that Magnano's behavior created a hostile work environment. See generally Mot. However, Defendant argues that Plaintiff's hostile work environment claim must be dismissed for two reasons: first, Plaintiff failed to exhaust administrative remedies because Plaintiff waited more than 45 days to contact EEO, Mot. at 7–

11; and second, there is no basis for imputing the conduct that created the hostile work environment to the employer, Mot. at 13–15.

### 1. Exhaustion of Administrative Remedies

Prior to bringing suit under Title VII, a federal government employee must:

> (1) consult with a counselor at the relevant agency's Equal Employment Office ("EEO") within 45 days of the alleged discriminatory act, see 29 C.F.R. § 1614.105(a)(1), and, if the matter is not resolved after a mandatory counseling period, (2) file a formal written administrative complaint ("EEO complaint") within 15 days of receipt of the EEO counselor's notice of final interview and right to file a formal complaint ("EEO notice"), see id. § 1614.106(a), (b). The employee may then file a civil action (i) within 90 days of notice of a final agency decision on his or her EEO complaint, or (ii) after 180 days from the filing of the EEO complaint if the agency has not yet rendered a decision. See 42 U.S.C. § 2000e–16(c); 29 C.F.R. § 1614.408(a), (b).

In most cases, failure to consult an EEO counselor within 45 days is grounds for dismissal. See, e.g., Tassy v. Buttigieg, No. 20-CV-2154, 540 F.Supp.3d 228, 234–36 (E.D.N.Y. May 17, 2021). However, "Title VII's timeliness requirement 'is not a jurisdictional prerequisite to suit in federal court, but a requirement that . . . is subject to waiver, estoppel, and equitable tolling.'" Lee v. Colvin, No. 15-CV-1472, 2017 WL 486944, at *6 (S.D.N.Y. Feb. 6, 2017) (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)). Here Plaintiff does not contend that she complied with the 45-day time limit, nor that the timeliness requirement was waived or the deadline tolled. Resp. at 13. However, she does contend that Defendant should be equitably estopped from enforcing the EEO deadline. Id. at 13–15.

Equitable estoppel "is not available against the government except in the most serious circumstances, and is applied with the utmost care and restraint." Rojas-Reyes v. INS, 235 F.3d 115, 126 (2d Cir.2000). In particular, "[w]e apply estoppel to the Government only in those limited cases where the party can establish both that the Government made a misrepresentation upon

9

which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct." City of New York v. Shalala, 34 F.3d 1161, 1168 (2d Cir.1993); see also Williams v. City of New York, No. 99-CV-0078, 2001 WL 770933, at *3 (S.D.N.Y. June 9, 2001) ("[W]hen defendant is a government agency, plaintiff must allege affirmative, serious misconduct by a government agent upon which a party reasonably relied to its detriment.").

Here, Plaintiff alleges that Larson and Rahn told her that they would conduct an investigation and hand it over to the EEO, advised her that there was nothing further she could do, and instructed her not to file an EEO complaint until after a November 26, 2019 meeting, three days after the deadline would have passed. Am. Compl. at 9. Plaintiff further alleges that Larson intentionally misled Plaintiff in order to prevent her from filing a timely complaint with the EEO. Id. at 10. Taking Plaintiff's factual allegations as true, she has alleged that the Government made a misrepresentation upon which she detrimentally relied. The question, then, is whether Plaintiff's allegation that Larson intentionally misled her, so as to prevent her timely filing, is sufficiently serious misconduct by a government agent to justify equitable estoppel.

Defendant argues that it is not for several reasons. First, Defendant contends that Plaintiff has alleged "that, at most, she misunderstood or was confused by the process." Reply at 4. This is not an accurate characterization of Plaintiff's Complaint, which alleges that she was intentionally misled. Am. Compl. at 9–10.

Second, Defendant argues that courts in this circuit have found "significantly more serious" misconduct insufficient to justify equitable estoppel against the Government. Reply at 5. Defendant cites two cases in particular—Lekettey v. City of New York, No. 14-CV-2528, 2015 WL 1442521 (S.D.N.Y. Mar. 30, 2015) and Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, (2d Cir. 1986)—but neither supports Defendant's position. In Lekettey, Defendant asserts, "the

10

plaintiff alleged that the government conspired to keep the findings of an investigation from her for two months." Reply at 4. While the Leketty plaintiff did allege, "albeit in conclusory fashion," that the defendants had conspired to delay her receipt of the results of an internal investigation, she did not allege they had misled her to believe that she must wait for the internal investigation to conclude before filing her EEOC complaint or that they otherwise delayed her filing. Lekettey, 2015 WL 1442521 at 5. Indeed, the Lekettey Court analogized to Williams v. City of New York, No. 99-CV-0078, 2001 WL 770933, at *3–4 (S.D.N.Y. July 10, 2001), where the plaintiff "missed [the] 300–day EEOC deadline because he was waiting to learn the outcome of his EEO complaint [but] had not pled 'serious, affirmative misconduct' . . . justifying equitable estoppel[]." Lekettey, 2015 WL 1442521, at *5 (quoting Williams, 2001 WL 770933, at *3–4).

The other case that Defendant cites, Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, (2d Cir. 1986), is similarly unavailing. In Dillman, the Second Circuit affirmed a grant of summary judgment, holding that the record evidence did not support the Plaintiff's contention that offers of severance were "dangled" in order to delay his filing of an EEOC claim, but rather demonstrated that the employer had bargained in good faith. Dillman, 784 F.2d at 62. Thus, the Second Circuit refused to invoke equitable estoppel, not because dangling severance offers in order to delay filing was insufficient to justify estoppel, but rather because the court concluded that no such dangling of severance offers had occurred.[2] In reaching that conclusion, the Second Circuit described the conditions under which equitable estoppel is appropriate, including in cases where "the employer has misrepresented the length of the limitations period or in some other

---

[2] Here, it is possible that after discovery, the Court will similarly find no evidence to support Plaintiff's claims of misconduct. However, at this stage the Court must accept Plaintiff's factual allegations as true.

way has lulled the plaintiff into believing that it was not necessary for him to commence litigation." Dillman, 784 F.2d at 61 (internal quotation marks omitted). That is precisely what Plaintiff has alleged occurred here.

Finally, in order to illustrate the severity of misconduct required to justify equitable estoppel, Defendant cites to Cordero v. Heyman, No. 97-CV-0435, 1998 WL 730558 (S.D.N.Y. Oct. 19, 1998). In Cordero, the plaintiff alleged that the regional EEO counselor filled out his complaint for him and volunteered to forward his complaint but failed to do so before the applicable deadline. Cordero, 1998 WL 730558, at *1. The Cordero court found this conduct sufficient to justify equitable estoppel. Id. at *4. The Court agrees with Defendant that the alleged government misconduct in Cordero was more severe than Plaintiff has alleged here. However, the difference is one of degree and not kind. Here, as in Cordero, Plaintiff has alleged that an agent of the employer promised to file a complaint, but failed to do so. Here, unlike in Cordero, Plaintiff did not actually provide a complaint to the agent, however, the Court does not find this difference sufficient to justify a difference in outcome. Plaintiff's allegations here are more akin to those of the Cordero plaintiff than to those of the Lekettey plaintiff, and the Court finds that they are sufficient, at this stage of the litigation, to justify application of equitable estoppel. As such, Defendant's Motion to Dismiss based on failure to exhaust administrative remedies is denied.

2. *Employer Liability*

"Where a hostile work environment is created by a co-worker who is not a supervisor, the employer can still be liable, but 'only for its own negligence.' . . . To demonstrate such negligence, a plaintiff must adduce evidence 'that the employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known,

12

about the harassment yet failed to take appropriate remedial action.'" Bentley v. AutoZoners, LLC, 935 F.3d 76, 92 (2d Cir. 2019) (quoting Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013)).

Defendant argues that DFAS was unaware of Magnano's harassment until more than a month after it had ceased. Mot. at 13. Plaintiff does not dispute this assertion,[3] instead arguing that once she informed DFAS of Magnano's harassment, Defendant failed to take adequate remedial action. Resp. at 15–18. Defendant, in turn, does not argue that the response to Plaintiff's report of harassment was adequate, instead contending that the hostile work environment cannot be imputed to Defendant because Defendant was unaware of the harassment at the time it occurred. Mot. at 12–15; Reply at 6–9. Thus, the question for the Court is this: If an employer learns of harassment and fails to take adequate remedial action, but no subsequent harassment occurs, can liability be imputed to the employer?

Courts addressing this question have reached different conclusions. Compare Fuller v. City of Oakland, Cal., 47 F.3d 1522, 1529 (9th Cir. 1995), as amended (Apr. 24, 1995) ("Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred" even when the harasser "voluntarily elects to cease his activities.") with Russell v. Roadway Package System, Inc., No. 96-CV-3779, 1997 WL 403502 at *7 (N.D.Ill. Jul.15, 1997) ("Since a hostile work environment did not continue once plaintiff made her employer aware of the past harassment, there is no basis for holding defendant liable for sexual harassment."). However, most courts agree that under Title VII, an employer's obligation, upon learning of harassment, is to take remedial action to prevent future harassment. See, e.g., Lapka v. Chertoff,

---

[3] Plaintiff does note that she informed Iselo that she was receiving inappropriate comments about her clothing, but she does not give any indication that Magnano was the one making these comments or that she told Iselo that Magnano was involved.

13

517 F.3d 974, 984–85 (7th Cir. 2008) ("The emphasis is on the prevention of future harassment . . . . So the question is not whether the punishment was proportionate to the offense but whether the employer responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring." (cleaned up)); Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997) ("[T]o determine whether the remedial action was adequate, we must consider whether the action was reasonably calculated to prevent further harassment." (internal quotation marks omitted)); McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 480 (7th Cir. 1996) ("An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made."); c.f. Fuller, 47 F.3d at 1529 ("It is the existence of past harassment, every bit as much as the risk of future harassment, that the statute condemns. Employers have a duty to express strong disapproval of sexual harassment, and to develop appropriate sanctions." (cleaned up)).

To support its interpretation of Title VII, Defendant cites this Court's decision in Beattie v. Farnsworth Middle School, 143 F.Supp.2d 220 (N.D.N.Y. 1998) (Kahn, J.). In Beattie, a teacher's aide alleged that she experienced sexual harassment from a teacher at her school. Beattie, 143 F.Supp.2d at 224. Among other forms of harassment, on several occasions the teacher forcibly hugged and kissed Beattie. Id. The third time this occurred, Beattie told the teacher to stop hugging and kissing her, after which, Beattie experienced no further harassment. Id. at 224, 229. Six months after the last incident of harassment, Beattie reported the harassment to the school principal. Id. at 229. This Court declined to impute liability to the school district since "it cannot be said that the District failed to stop the alleged harassment because the harassment was not continuing when brought to the District's attention." Id.

14

Defendant interprets Beattie to hold that liability can never be imputed to an employer unless the harassment continues after it is reported to the employer. However, Beattie need not be interpreted to go that far. In Beattie, the alleged harasser had ceased his harassment six months prior, and the school district had no reason to believe that any action was required to prevent future harassment. By contrast, here Plaintiff went on unpaid leave only days after her latest request that Magnano cease contacting her and reported the harassment just over a month later while still on leave. Furthermore, Magnano had not respected Plaintiff's previous request that he cease contact with her. Am. Compl. at 5–6. Where, as in Beattie, it is apparent the harassment has ceased such that no remedial action is required to prevent future harassment, the employer may not be obligated to take remedial action. Here, however, it was less clear that the harassment would not resume upon Plaintiff's return from leave. Cf. Knabe, 114 F.3d at 413 (declining to impute hostile work environment to employer only because plaintiff "presented no evidence that there would have been a hostile work environment had she returned or that [the harasser] would have felt free to continue his harassment upon her return to work").

Consistent with most other court decisions, this Court finds that when an employer receives a report of a hostile work environment resulting from sexual harassment, it must take action reasonably calculated to prevent further harassment. In some cases, such as in Beattie, this may entail no action on the part of the employer, while in other cases, such as certain cases involving sexual assault, inaction may render the employer liable, even if the harasser unilaterally decides to cease the harassment. Here, because Defendant does not contend that its response to Plaintiff's report of harassment was adequate, the Court need not determine what, if any, action was required by Defendant, and Defendant's motion to dismiss Plaintiff's hostile work environment claim is denied.

### C. Retaliation

"To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that shows '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Littlejohn v. City of New York, 795 F.3d 297, 315–16 (2d Cir. 2015) (quoting Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)).

Here, Plaintiff's Amended Complaint alleges three forms of retaliation. First, it alleges that Plaintiff was denied an accountant position for which she applied, second, it alleges that Plaintiff was harassed by coworkers, and third, it alleges that Plaintiff was intentionally moved to a workspace close to her harasser. See Am. Compl. at 12–16, 19. In his Motion to Dismiss, Defendant argues that, with regard to denial of the accountant position, Plaintiff has failed to meet prongs (2) and (4) of the prima facie test. Mot. at 17–19. With regard to Plaintiff's allegation of harassment from coworkers, Defendant argues that Plaintiff has failed to meet prong (3). Id. at 16–17. While Defendant's Motion discusses an alleged delayed transfer, it makes no mention of Plaintiff's allegation that her work location was moved so as to place her near her harasser. See generally id. Defendant does address Plaintiff's allegation in his Reply, Reply at 11, however "[t]his Court generally will not consider arguments raised for the first time in a reply brief." Espinal-Cruz v. Rosen, 832 F. App'x 95, 96 (2d Cir. 2021) (quoting Patterson v. Balsamico, 440 F.3d 104, 113 n.5 (2d Cir. 2006)); see also Barrows v. Brinker Rest. Corp., No. 519-CV-144, 2020 WL 1511077, at *2 (N.D.N.Y. Mar. 30, 2020) ("It is well-established that '[a]rguments may not be made for the first time in a reply brief.'" (quoting Zirogiannis v. Seterus, Inc., 221 F. Supp. 3d 292, 298 (E.D.N.Y. 2016), aff'd, 707 F. App'x 724 (2d Cir.

2017)))). Thus, Plaintiff's claim of retaliation based on relocation of her workspace survives Defendant's Motion.[4]

In her Response, Plaintiff concedes that the alleged co-worker harassment does not qualify as an adverse employment action as a matter of law. Resp. at 20. As such, the only remaining issues relate to Plaintiff's denial of the accounting position for which she applied.

There is some ambiguity in Plaintiff's filings about who played what role in the hiring process. Plaintiff's Amended Complaint describes Kristen Szarek as a "Plaintiff's Hiring Official" but also notes that "AM&C Director Jeffrey Ferguson and Matthew Browne, Deputy Director, Accounting Operations, were involved [in] approving the budget for the [h]iring." Am. Compl. at 12–13. However, the Final Agency Decision, incorporated by reference into Plaintiff's Amended Complaint, describes Ferguson as the "selecting official," Dkt. No. 1-1 at 8, and Plaintiff reaffirms this characterization in her Response, Resp. at 24. Given that Plaintiff describes Szarek as "unsure why Plaintiff was denied the position," Am. Compl. at 13, and that the ultimate reason provided for Plaintiff's denial was a budgetary constraint, Resp. at 9, the Court construes Plaintiff's theory of liability to be that Ferguson retaliated against Plaintiff by

---

[4] The Court notes that even if it were to consider the arguments Defendant raises in his Reply, Plaintiff's claim would still survive. Defendant attempts to characterize Plaintiff's allegation as "a challenge to the sufficiency of DFAS's actions taken to remediate the hostile work environment" rather than a claim of retaliation. Reply at 10. However, Plaintiff's allegation is not that Defendant failed to move her away from Magnano, it is that she was moved closer to Magnano as a form of retaliation. Am Compl. at 14–15. Defendant also notes that Plaintiff has filed a document that includes testimony of Deputy Director Matthew Browne, which indicates that Plaintiff's workspace was unintentionally moved closer to Magnano, and that Plaintiff was again relocated several days later. Reply at 7 (citing Dkt. No. 28-2 at 5–6). However, even if the Court were to consider Dkt. No. 28-2, Browne's testimony is contradicted by the factual statements in Plaintiff's Amended Complaint, including that "Plaintiff's workspace was never moved away from her harasser after this retaliatory transfer." Am. Compl. at 15. Because the Court must accept Plaintiff's factual allegations as true, contrary evidence would be insufficient to justify dismissal at this stage.

17

using budgetary constraints as a pretext for hiring at the GS-07 grade level rather than at the GS-09 grade level at which Plaintiff applied.

Given this theory of liability, the first question is whether Ferguson knew of the protected activity. Plaintiff has adequately pled that he did, noting that Ferguson was made aware of the protected activity in mid-February as evidenced by his statements in the EEOC investigative report. Am. Compl. at 12–13.

The Second question that must be addressed is whether Plaintiff has established a causal connection between the protected activity and her denial of the accounting job. To establish a causal connection, Plaintiff relies entirely on temporal proximity between the protected activity and the adverse action. See Am. Compl. at 20; Resp at 20–23. Defendant contends that temporal proximity is insufficient here because (1) "there can be no inference of retaliatory intent if the decisionmakers were unaware of the protected activity," (2) "Plaintiff's own allegations [regarding Sczarek] defeat any inference of retaliatory intent," and (3) the documents Plaintiff submitted indicate that "she was not selected because DFAS elected to hire from the GS-7 list of qualified candidates for budgetary reasons." Here, the Court finds none of these contentions compelling given that (1) Plaintiff has adequately alleged that Ferguson was aware of the protected activity, (2) the Court has construed Plaintiff's retaliation allegations as being directed at Ferguson rather than Sczarek, and (3) Plaintiff's theory is that the budgetary reasons given for her denial were in fact a pretext for retaliation, Resp. at 9.

In general, "[a]llegations of close temporal proximity . . . can raise an inference of discrimination sufficient to withstand a motion to dismiss . . . provided that the alleged temporal proximity is 'very close.'" Powell v. Merrick Acad. Charter Sch., No. 16-CV-5315, 2018 WL 1135551, at *6 (E.D.N.Y. Feb. 28, 2018) (quoting Clark County Sch. Dist. v.

18

Breeden, 532 U.S. 268, 273 (2001) (per curiam)). "While 'temporal proximity must be very close,' . . . there is no 'bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish [causation].'" Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 254 (2d Cir. 2014) (finding that five months might qualify as "very close" temporal proximity) (quoting Clark County Sch. Dist., 532 U.S. at 273 and then quoting Gorman–Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001)). Here, Plaintiff has alleged that she was denied the accounting position on March 6, 2020, 23 days after filing her EEO complaint and 107 days after initially complaining of harassment. Am. Compl. at 9, 12–13. As such, the Court concludes that "Plaintiff has . . . alleged a causal connection based on temporal proximity, and . . . is not required to provide other evidence of causation to survive a motion to dismiss. At this stage, then, Plaintiff has sufficiently pled a claim for Title VII retaliation, and the Court cannot dismiss the claim for lack of a weightier causal connection allegation." Garcia v. Yonkers Bd. of Educ., 188 F. Supp. 3d 353, 362 (S.D.N.Y. 2016).

Having concluded that Plaintiff has sufficiently pled the elements of a retaliation claim based on her denial of the accounting job, court must deny Defendant's Motion to Dismiss with regard to this claim.

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 25) is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:   June 3, 2022
             Albany, New York

LAWRENCE E. KAHN
United States District Judge