**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

AUDREE PACHURA,

                                        Plaintiff,                    6:21-cv-316
                                                                      (AMN/MJK)
v.

LLOYD J. AUSTIN, III,

                                        Defendant.

_____

**APPEARANCES:**                                    **OF COUNSEL:**

**LAW OFFICE OF PATRICK SORSBY**                    **PATRICK SORSBY, ESQ.**
1568 Central Avenue, 1st Floor
Albany, NY 12205
_Attorneys for Plaintiff_

**CARLA B. FREEDMAN**                               **KAREN F. LESPERANCE, ESQ.**
United States Attorney for the                      **C. HARRIS DAGUE, ESQ.**
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, NY 12207-2924
_Attorneys for Defendant_

**CARLA B. FREEDMAN**                               **FORREST T. YOUNG, ESQ.**
United States Attorney for the
Northern District of New York
100 S Clinton Street – Suite 900
Syracuse, NY 13261
_Attorneys for Defendant_

**Hon. Anne M. Nardacci, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

On March 21, 2021, Plaintiff Audree Pachura ("Plaintiff") commenced this action against

Lloyd J. Austin, III ("Defendant") in his official capacity as the U.S. Secretary of Defense alleging

Title VII employment discrimination claims.  Dkt. No. 1.[1]  On October 21, 2021, Plaintiff filed an Amended Complaint alleging only certain of the originally pled Title VII claims, namely hostile work environment and discriminatory failure to promote and retaliation claims.  Dkt. No. 22. Presently before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 52 ("Motion"), Plaintiff's opposition, Dkt. Nos. 53-56, and Defendant's reply in further support of the Motion, Dkt. No. 59.  For the reasons set forth below, Defendant's Motion is granted.[2]

## II.    BACKGROUND

On June 25, 2018, the Defense Finance Accounting Service ("DFAS"), a Division of the Department of Defense, hired Plaintiff as a part-time student intern at the GS-4 pay grade in their Rome, New York location.  Dkt. No. 52-2 at ¶¶ 1-2.[3]  In 2019, DFAS employed David Magnano ("Mr. Magnano") as a lead accounting technician within DFAS's Finance Directorate at the same facility as Plaintiff.  Id. at ¶ 17.  At all times relevant to this case, Mr. Magnano and Plaintiff were not in the same work unit at DFAS and did not work on any assignments or projects together.  Id. at ¶ 20.  However, at some point in 2019, Mr. Magnano was the Chief Shop Steward for the facility's union.  Dkt. No. 55 at ¶ 4.

### A.  INTERACTIONS BETWEEN PLAINTIFF AND MR. MAGNANO

On July 23, 2019, Mr. Magnano sent Plaintiff a "poke" on Facebook.  Dkt. No. 52-2 at ¶ 25.  Prior to the "poke," Plaintiff and Mr. Magnano did not know each other and had never had an

---

[1] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system.

[2] The case was reassigned to the undersigned on January 19, 2023.  Dkt. No. 40.

[3] Unless otherwise noted, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response.  See N.D.N.Y. L.R. 56.1.

in-person conversation. *Id.* at ¶ 26. On the same day, Plaintiff responded to Mr. Magnano's "poke" with a private message. *Id.* at ¶ 28. Over the course of that day, Plaintiff and Mr. Magnano exchanged nearly 100 messages, and they continued to message each other almost every day until October 9, 2019. *Id.* at ¶¶ 30, 31. The two exchanged messages during work hours and on personal time. *Id.* at ¶ 32.

At all times relevant to this case, both Mr. Magnano and Plaintiff were in romantic relationships with other people. *Id.* at ¶¶ 36, 37. Mr. Magnano's girlfriend also worked at DFAS. *Id.* at ¶ 36. Despite this, the parties do not dispute that Plaintiff and Mr. Magnano quickly began to exchange flirtatious banter. *Id.* at ¶ 41.[4] At certain points, Plaintiff pushed back on Mr. Magnano's more aggressive messages. For example, on August 9, 2019, after discussing Plaintiff's tattoos and Mr. Magnano raising the idea of sending pictures of themselves to each other, Plaintiff messaged: "What I should say is I think that you seem like a really great guy that I would enjoy spending time with . . . . maybe a little too much lol. Given that we are both in committed relationships, and me being a loyal and faithful person, anything more than a conversation is out of the question[.]" Dkt. No. 55 at ¶ 11(h). However, at various points, Plaintiff also contributed to the sexually charged nature of the conversation. For example, later on August 9, 2019, Plaintiff told Mr. Magnano that she wished they had met at a different time in their lives and told Mr. Magnano "[i]t's difficult to be friends when you can cut the sexual tension with a

---

[4] For example, on August 5, 2019, Mr. Magnano messaged Plaintiff: "I hope you don't mind me saying but you have great legs!" Plaintiff responded: "Thank you!! Lol you wouldn't be the first to say that about my legs, and I take it as a 100% non creepy compliment!!" Dkt. No. 52-14 at GOV-001610. On August 8, 2019, Plaintiff and Mr. Magnano sent pictures of their tattoos, and Mr. Magnano suggested meeting in the union office at DFAS, which he described as lacking cameras, to view Plaintiff's tattoos. *Id.* at GOV-001629-1635. On August 9, 2019, Plaintiff messaged Mr. Magnano: "you keep arousing me with all this flirting . . .". *Id.* at GOV-001642-1643. For a full review of the messages between Plaintiff and Mr. Magnano, *see* Dkt. No. 52-14.

3

knife." Dkt. No. 52-2 at ¶ 40; Dkt. No. 52-14 at GOV-001641.

Plaintiff and Mr. Magnano's conversation eventually led to Mr. Magnano sending Plaintiff a picture of his genitals. Early on August 12, 2019, Mr. Magnano strongly suggested to Plaintiff that he was willing to send a "non PG" picture of himself. *Id.* at ¶ 43. He then commented: "I've noticed you haven't said no to the non [PG-rated] pic." *Id.* at ¶ 44. Plaintiff responded that, based on a prior conversation in which Mr. Magnano expressed concern that he had "accident[ally]" sent Plaintiff a "dirty photo," Dkt. No. 52-14 at GOV-001657, she "believed he was most reluctant[,]" *id.* at GOV-001658. Mr. Magnano expressed that he was "starting to wonder if [Plaintiff] wouldn't mind" receiving such a picture, and suggested that receiving the picture "would definitely brighten up [Plaintiff's] Monday work day[.]" *Id.* Plaintiff replied by asking "Think so? lol[.]" *Id.* Mr. Magnano answered: "Maybe, only one way to find out I guess lol[.]" *Id.* at GOV-001659. Plaintiff responded: "I think you just wanna send me your pics man lol." *Id.* Later than night, after the conversation had turned to other topics, Mr. Magnano sent Plaintiff a picture of his genitals. *Id.* at GOV-001661; Dkt. No. 52-2 at ¶ 45. Early the next morning, Mr. Magnano apologized and said he meant to send the picture to someone else, to which Plaintiff responded, "lol I'm sure." Dkt. No. 52-2 at ¶¶ 46-47. Mr. Magnano apologized again and responded, "I just hope I didn't make you feel too uncomfortable . . . Hopefully you still want to chat but if not, I understand." *Id.* at ¶ 48. Plaintiff replied, "Lol I am just glad my boyfriend wasn't around when I opened it," followed by two laughing emojis. *Id.* at ¶ 49.

Plaintiff and Mr. Magnano continued to chat via Facebook Messenger almost every day, with Plaintiff refusing or ignoring Mr. Magnano's more forward suggestions while also continuing to engage in banter. For example, the very next day, on August 13, 2019, after Mr. Magnano raised the possibility of meeting in person to learn how to hula hoop from Plaintiff, Plaintiff

explained that she thought hula hooping may lead to more and that she didn't want that. Dkt. No. 52-14 at GOV-001664. Plaintiff also pointed out that she was an intern and that she didn't want "anything inappropriate to happen." *Id.* However, on August 15, 2019, Plaintiff messaged Mr. Magnano that she had seen him go into the men's room and joked that she was going to follow him into the restroom. *Id.* at GOV-001665-1666. Later in August 2019, Mr. Magnano began sending Plaintiff memes, including one which said, "We don't report sexual harassment here. We grade it." *Id.* at GOV-001671. Plaintiff did not respond to the meme. *Id.* Mr. Magnano also began telling Plaintiff that he wished to drop a pen under her desk. *Id.* at GOV-001675. On one such occasion, Plaintiff responded, "Oh gosh, you're something else[,]" to which Mr. Magnano replied, "you don't seem to mind one bit" with a winking emoji. *Id.* at GOV-001676. Plaintiff responded: "[l]et's not assume here lol[.]" *Id.* Mr. Magnano then messaged: "[t]hat was more of a question lol[.] Because if you do mind, I will tone it down[.]" *Id.* Plaintiff did not tell Mr. Magnano whether she minded or not. *Id.* Later, on August 26, 2019, Mr. Magnano messaged Plaintiff that she looked "good in that dress." *Id.* Plaintiff responded, "I look better out of it" with two laughing emojis. *Id.*

At some point in August 2019, Plaintiff informed her Director, Lisa Iselo, that she was uncomfortable wearing tank tops and shorts to work because she was receiving inappropriate comments about her clothes. Dkt. No. 55 at ¶ 13. Plaintiff did not specify who was making inappropriate comments, and Ms. Iselo did not ask any further questions. *Id.*

On September 12, 2019, Plaintiff claims she had a seizure and fainted in reaction to Mr. Magnano's messages. At 11:50 A.M., Mr. Magnano messaged, "[s]ooo . . . watcha wearing? lol[.]" Dkt. No. 52-2 at ¶ 54. At 3:21 A.M. the next day, Plaintiff apologized for not responding sooner and informed Mr. Magnano that she "had a seizure and fainted at lunch and had to go the

ER." *Id.* at ¶ 55.  Plaintiff avers that she suffered a seizure, Dkt. No. 55 at ¶ 14, but Defendant points out that Plaintiff also testified that her doctors "didn't think it was an epileptic seizure" and that "[i]t might have been a syncopal event" which she believed meant "fainting."  Dkt. No. 52-12 at 165:24-166:1.

Following Plaintiff's medical episode, the pair continued to message on Facebook in much the same manner as they had, though Plaintiff asserts that the messages were less frequent from that point onward.  Dkt. No. 52-2 at ¶ 57; Dkt. No. 55 (Response) at ¶ 57; *see generally* Dkt. No. 52-14 at GOV-001683-1688.  Plaintiff ended the conversation with Mr. Magnano on October 9, 2019.  She messaged Mr. Magnano: "Listen Dave, we are going to have to discontinue this conversation because I've denied your advances and you haven't stopped and if it continues I'll have to reach out to HR." *Id.* at ¶ 59.  Mr. Magnano responded: "My apology Audree. I didn't know it was really bothering you. I thought it was just in fun. I didn't intend to make you uncomfortable and I will stop.  Once again, I apologize I will keep things civil, it was never my intention to make things uncomfortable and I was in the wrong.  That won't happen again[.]" *Id.* Plaintiff responded: "Thank you, truly." *Id.*   Mr. Magnano did not send another message to Plaintiff after October 9, 2019.  *Id.* at ¶ 60.

Plaintiff's deposition provides further context for her conversation with Mr. Magnano.  In her deposition, Plaintiff explained that she was sexually abused as a young girl, and as a result, she developed a defense mechanism of using "light joking" as a method of dealing with harassment. Dkt. No. 55 at ¶ 8 (citing Dkt. No. 53-1 at 104).  Plaintiff also explained that she kept responding to Mr. Magnano's messages in fear that she would be assaulted, in fear that he would come to her desk if she did not respond, and in fear that he would spread rumors.  *Id.* at ¶ 9.  Plaintiff also described the situation as being "aroused by someone you don't want to be aroused by," and told

Mr. Magnano that she liked to have control over her life. *Id.* at ¶ 10. Finally, Plaintiff testified in her deposition that she might have told Mr. Magnano that she was having issues getting her work done and that her work performance dipped during certain periods of her conversation with Mr. Magnano. Dkt. No. 53-1 at 80:15-82:12.

### B. LEAVE, THE REPORT TO DEFENDANT, AND THE RESPONSE

On October 8, 2019, one day prior to Plaintiff discontinuing the conversation with Mr. Magnano, Plaintiff emailed her DFAS supervisors Stanley Greer and Lisa Iselo, along with Human Resources Liaisons William Larson and Thomas Rahn, to inform them that she was reducing her part-time work schedule from three days per week down to one day due to her demanding courseload. Dkt. No. 52-2 at ¶ 63. Later than month, on October 23, 2019, Plaintiff emailed her coworkers, Ms. Greer, Ms. Iselo, and Mr. Larson, to inform them that she would be entering a period of voluntary leave without pay for the rest of her academic semester. *Id.* at ¶ 64. On November 19, 2019, Plaintiff called Mr. Larson and requested to extend her leave without pay due to medical issues. *Id.* at ¶ 66. As a result, Plaintiff was on voluntary leave without pay status from October 23, 2019 until February 18, 2020. *Id.* at ¶ 67.

During the November 19, 2019 phone call with Mr. Larson, Plaintiff informed him that she had been sexually harassed by Mr. Magnano. *Id.* at ¶ 68. During the call, Mr. Larson told Plaintiff that he would consult with Human Resources Liaison Thomas Rahn and get back to her in response to the allegations of harassment. *Id.* at ¶ 69. The next day, on November 20, 2019, Mr. Larson and Mr. Rahn called Plaintiff back together and informed her that Mr. Rahn would initiate a DFAS management inquiry into her claims. *Id.* at ¶ 71. Plaintiff and Mr. Rahn agreed that Lisa Iselo would lead the management inquiry. *Id.* at ¶ 72.

After being appointed to lead the management inquiry, Ms. Iselo soon consulted with

Labor/Management Employee Relations and reviewed DFAS' anti-harassment policy. *Id.* at ¶ 75. On November 26, 2019, seven days after Plaintiff informed Mr. Larson of the alleged harassment, Ms. Iselo interviewed Plaintiff at Plaintiff's home about the allegations against Mr. Magnano. *Id.* at ¶¶ 76-77. During this meeting, Plaintiff provided Ms. Iselo with a copy of the Facebook Messenger exchanges. *Id.* at ¶ 78. Plaintiff also informed Ms. Iselo that she had been suffering from various medical issues, including a seizure, which she believed were related to Mr. Magnano's alleged sexual harassment. *Id.* at ¶ 79.[5] On December 4, 2019, Ms. Iselo interviewed Mr. Magnano, and Mr. Magnano acknowledged that he sent the Facebook messages. *Id.* at ¶ 80. Mr. Magnano informed Ms. Iselo that he believed he and Plaintiff were two friends who were having consensual, racy conversation, although he acknowledged that it could be perceived as inappropriate by an outsider. *Id.* at ¶ 81. He said that he was not aware that Plaintiff was uncomfortable until her October 9, 2019 message discontinuing their conversation. *Id.* Ms. Iselo also interviewed Elizabeth Hardison, whose desk was next to Plaintiff's, on December 11, 2019. *Id.* at ¶¶ 82, 83. Ms. Hardison informed Ms. Iselo that, for a period of time, Mr. Magnano and another female (who Ms. Iselo surmised to be Mr. Magnano's girlfriend) visited Plaintiff's desk 3-4 times per week. *Id.* at ¶ 84. Ms. Hardison did not overhear any of their conversations or see anything inappropriate. *Id.* at ¶ 86. However, Ms. Hardison stated that at one point she asked Plaintiff if they were working on something together, and Plaintiff told Ms. Hardison that Mr. Magnano was "stalking her on Facebook and making her uncomfortable." *Id.* at ¶ 87.

On December 10, 2019, Ms. Iselo requested that both Plaintiff and Mr. Magnano sign a No Contact Order to prevent all further contact between them. *Id.* at ¶ 90. Mr. Magnano signed on

---

[5] Defendant asserts that there is no evidence that Plaintiff's medical problems were caused by Mr. Magnano's conduct other than Plaintiff's testimony. Dkt. No. 59 (Response) at ¶ 14.

December 11, 2019, and Plaintiff signed on December 13, 2019. *Id.* at ¶¶ 91, 92. Later, on January 24, 2020, Ms. Iselo prepared a draft Report of Inquiry, which was finalized on March 30, 2020 after feedback from both Labor/Management Employee Relations and the Office of General Counsel. *Id.* at ¶¶ 94-96. The final determination of Ms. Iselo's management inquiry was that "[n]o harassing conduct occurred; however other inappropriate behavior did occur[,]" and that "[m]anagement will address the behavior." *Id.* at ¶ 98. Ms. Iselo emailed Plaintiff a copy of the report on March 31, 2020 and reminded Plaintiff that she was expected to "remain fully engaged while on duty" and that she should limit the use of her personal phone while at work. *Id.* at ¶ 99; Dkt. No. 52-3 at 22. The report was also sent to Mr. Magnano and his supervisor. *Id.* at ¶ 100. In May 2020, Mr. Magnano's supervisor suspended Mr. Magnano without pay for seven days based on his conduct in relation to Plaintiff. *Id.* at ¶ 101; Dkt. No. 55 (Response) at ¶ 101; Dkt. No. 52-24.[6]

## C.  ACCOUNTANT APPLICATION

On November 21, 2019, while on voluntary leave without pay and two days after her initial report of the alleged harassment, Plaintiff applied for a full-time accountant position at DFAS. *Id.* at ¶ 102. At the time, Plaintiff was still a full-time student in a Masters Program and was on voluntary leave without pay, which had recently been extended until June 2020. *Id.* at ¶ 103. Applicants for the position could apply for consideration at any (or all) of the GS-7, GS-9, or GS-11 pay grades. *Id.* at ¶ 104. Plaintiff only applied for consideration at the GS-9 and GS-11 levels, so Plaintiff was not on the hiring list for the position at the GS-7 level. *Id.* at ¶ 105. Plaintiff contends that the job listing stated that there were multiple vacancies for the position. Dkt. No. 55

---

[6] Plaintiff contends that rather than punishing Mr. Magnano, he was promoted and transferred while Plaintiff was on medical leave. Defendant insists Mr. Magnano was instead transferred to a new position in September 2019, prior to Plaintiff's complaint. Dkt. No. 59 at ¶ 21.

at ¶ 35.  Defendant agrees insofar that the posting stated "many vacancies" were available at the

listed locations, including Indianapolis, Limestone, Rome, and Cleveland, but denies that there

was more than one position available at Plaintiff's location.  Dkt. No. 59-1 (Response) at ¶ 35

(citing Dkt. No. 53-21).  Defendant also points to deposition testimony that there was only one

position in Rome available.  *Id.*

Jeffrey Ferguson, the Director of Accounts Maintenance and Control, was the official

tasked with making the ultimate hiring decision for the accountant position.  Dkt. No. 52-2 at ¶

107.  Mr. Ferguson appointed Kristen Szarek, a manager within DFAS's Accounting Directorate,

to lead the interview process.  *Id.* at ¶ 108.  Plaintiff interview for the position on January 13, 2020.

*Id.* at ¶ 111.  Of the candidates on the GS-7 list, Margaret Hammond, who was employed as an

Accounting Technician at DFAS at the time she applied for the accountant position, obtained the

highest score for her interview.[7]  *Id.* at ¶ 113.[8]  Plaintiff obtained the highest score of all of the

candidates on any of the three lists.  *Id.* at ¶ 114; Dkt. No. 55 (Response) at ¶ 114.  After the

interviews, Ms. Szarek, the manager appointed by Mr. Ferguson to run the interviews,

recommended to Mr. Ferguson that Ms. Hammond be hired for the position due to budget

constraints.  *Id.* at ¶ 115.  It is undisputed that Ms. Szarek was not aware of Plaintiff's sexual

harassment complaint when she recommended that Mr. Ferguson hire Ms. Hammond.  *Id.* at ¶ 116.

Mr. Ferguson officially selected Ms. Hammond for the Accountant position at the GS-7 pay grade

on January 17, 2020.  *Id.* at ¶ 117.  It is similarly undisputed that Mr. Ferguson was not aware of

---

[7] According to Ms. Szarek, candidates were scored based on their performance in answering a list
of interview questions written by Ms. Szarek and approved by Mr. Ferguson.  *Id.* at ¶¶ 109, 112.
Each interview question was worth up to 5 points and related to the skills and duties required for
the position.  Dkt. No. 52-4 at 8-9.  The candidates' resumes were not rated or ranked because they
had been pre-approved by Human Resources.  *Id.*

[8] Plaintiff contends that Ms. Hammond was the only candidate on the GS-7 list.  Dkt. No. 55
(Response) at ¶ 113.

Plaintiff's sexual harassment complaint when he selected Ms. Hammond for the position. *Id.* at ¶ 118. In his deposition, Mr. Ferguson stated that Plaintiff was not hired for "budgetary reasons." Dkt. No. 52-25 at 73:12. Mr. Ferguson also stated in a declaration that after the interviews, "had [DFAS] not received a good candidate at the GS-07 level, they may have decided to make a selection at the GS-9 level, despite the increased cost. This was not the case with this selection as we did have at least one viable candidate at the GS-7 level." Dkt. 53-11 at 5.[9]

Ms. Hammond was offered and accepted the position on January 17, 2020, and Plaintiff was informed that she was not selected for the accountant position on March 6, 2020. Dkt. No. 52-2 at ¶¶ 120, 122. Plaintiff avers that Ms. Szarek had told her during a February 13, 2020 phone call that she was going to be hired for the position. Dkt. No. 55 at ¶ 39 (citing Dkt. No. 53-14 at 14). Plaintiff also avers that she reached out to Ms. Szarek on March 6, 2020 after receiving the notice that she was not hired and that Ms. Szarek told her that she still had a month left to pick from the hiring list at the GS-9 level. *Id.* at ¶ 42. Ms. Szarek contends that Plaintiff misunderstood these conversations. Ms. Szarek avers that the February 13, 2020 phone call concerned Plaintiff's transfer to the Accounting Directorate after her medical leave and the plan to convert her to a full-time position with the same after her graduation, as discussed below. Dkt. No. 59 (Response) at ¶¶ 39, 42; Dkt. No. 52-4 at ¶ 8. Ms. Szarek also avers that on March 6, 2020 she explained to Plaintiff that budget limitations informed the hiring decision for the position accepted by Ms. Hammond, but that she would like Plaintiff to stay with the Accounting Directorate after her graduation in a full-time position. Dkt. No. 52-4 at ¶¶ 6-7, p. 9. Ms. Szarek denies mentioning having a month left to pick from a hiring list at the GS-9 level for the position that was filled by

---

[9] Plaintiff's statement of material facts mischaracterizes Mr. Ferguson's statement and attempts to ignore the final sentence. Dkt. No. 55 at ¶ 46.

Ms. Hammond. *Id.* at ¶¶ 6-7. Instead, Ms. Szarek contends she informed Plaintiff that Plaintiff remained on a list of eligible GS-9 candidates "for multiple position announcements across all of DFAS." *Id.* at ¶ 7. Thus, Ms. Szarek contends that she informed Plaintiff about her remaining eligibility for other positions that utilized the same list of eligible candidates but denies telling Plaintiff that she remained a contender for the position filled by Ms. Hammond. *Id.*

### D.  TRANSFER TO ACCOUNTING AND CUBICLE PLACEMENT

On January 8, 2020, Plaintiff emailed Ms. Iselo, the official in charge of the management inquiry into her allegations, and Human Resources Liaisons Larson and Rahn requesting to return to work from her voluntary leave the week of February 16, 2020. *Id.* at ¶ 123. On February 5, 2020, Ms. Iselo recommended to Mr. Larson that Plaintiff's internship be transferred from Finance to Accounting upon her return, and that she be offered a permanent position in the Accounting Directorate upon her graduation. *Id.* at ¶ 124. Ms. Iselo made this recommendation because Plaintiff had previously indicated an interest in working in the Accounting Directorate and because Plaintiff was just three months short of achieving her master's degree in accounting. *Id.* at ¶¶ 124-27. The next day, on February 6, 2020, Mr. Larson forward Ms. Iselo's recommendation to Mr. Ferguson, the Director of the Accounting Directorate, and Mr. Ferguson agreed with Ms. Iselo's recommendations. *Id.* at ¶¶ 128-29. Ms. Iselo then coordinated with Ms. Szarek, who would be Plaintiff's second level supervisor upon her transfer to Accounting, to effectuate the transfer. *Id.* at ¶ 130. Once informed of the transfer, Plaintiff expressed that she thought it was a great idea. *Id.* at ¶ 131.

On February 10, 2020 Ms. Szarek began coordinating with other DFAS staff to assign Plaintiff to a new cubicle in the East Wing of the DFAS building, where the Accounting Directorate was located. *Id.* at ¶ 132. Again, it is undisputed that when a cubicle was chosen in

the East Wing, Ms. Szarek was unaware of Plaintiff's sexual harassment complaint. *Id.* at ¶ 135. Plaintiff returned from leave without pay on February 18, 2020 and began working part-time, two days per week. *Id.* at ¶ 136. Plaintiff was unhappy about the location of her new cubicle, which was at the end of a row of cubicles closest to the main walkway, because she believed it was too close to Mr. Magnano's cubicle, which was five cubicle rows away. *Id.* at ¶¶ 138-39.

On or about February 20, 2020, Plaintiff complained about her cubicle location to her first-line supervisor, Angela Nikolaus. *Id.* at ¶ 140. Ms. Nikolaus informed Ms. Szarek of Plaintiff's concern, and Ms. Szarek told Plaintiff that Mr. Magnano had no reason to be near her cubicle location other than the main walkway, and instructed Plaintiff to immediately inform her or someone else if Mr. Magnano approached her. *Id.* at ¶¶ 141-42. Ms. Szarek also told Plaintiff that she would look for a new cubicle for Plaintiff, but there were no available cubicles at that time, so other arrangements would need to be made. *Id.* at ¶ 143.

Separately, around the same time, Plaintiff informed Equal Employment Opportunity ("EEO") Specialist Robert Hudson that she was uncomfortable with her new cubicle location. *Id.* at ¶ 144. On the same day, Mr. Hudson informed Matthew Browne, Deputy Director of DFAS Rome, of Plaintiff's concerns. *Id.* at ¶¶ 144-45. Mr. Browne then informed Mr. Ferguson, the Director of the Accounting Directorate, and HR Liaison Larson of Plaintiff's concerns and instructed Mr. Ferguson to coordinate Plaintiff's relocation to a lower traffic area. *Id.* at ¶ 148. After learning about the allegations for the first time, Mr. Ferguson contacted Ms. Iselo for more details on the allegations and communicated to Plaintiff's supervisors that she should be moved to a new cubicle. *Id.* at ¶¶ 150-51. The parties dispute whether Plaintiff was ever actually moved to a new cubicle, though Mr. Browne has stated she was moved within 3 to 4 days. *Id.* at ¶ 152; Dkt. No. 55 (Response) at ¶ 152; Dkt. No. 59-1 (Response) at ¶ 33.

DFAS employees shifted to full-time telework due to COVID on or about March 13, 2020, and Plaintiff has worked fully remotely since March 2020. *Id.* at ¶¶ 154-155. Building access records suggest that Plaintiff and Mr. Magnano were never on the DFAS Rome site at the same time between Plaintiff's return to work and the beginning of COVID-related telework. *Id.* at ¶ 156.[10] The parties do not dispute the fact that Plaintiff and Mr. Magnano never saw each other between Plaintiff's return from leave in February 2020 and the office shutdown in March 2020. *Id.* at ¶ 157.

On April 6, 2020, Plaintiff filed an EEO complaint based on Mr. Magnano's alleged harassment and DFAS's response. *Id.* at ¶ 163. A Final Agency Decision was issued on December 21, 2020 which found Plaintiff's claims were unfounded because management articulated legitimate reasons for its actions and Plaintiff failed to provide sufficiently persuasive evidence to rebut those explanations. *Id.* at ¶ 164. The Final Agency Decision informed Plaintiff that she could file a civil action in United States District Court within 90 calendar days of the decision. *Id.* at ¶ 165. Plaintiff filed this lawsuit on March 21, 2021. Dkt. No. 1.

Plaintiff graduated with her master's degree in May 2020 and received an offer from DFAS for a conversion to a full-time accountant position at the GS-7 level on May 28, 2020. Dkt. No. 52-2 at ¶ 159. Plaintiff accepted the position on June 4, 2020 and remains employed by DFAS. *Id.* at ¶¶ 13, 160.

---

[10] Plaintiff denies that she was never in the building with Mr. Magnano. In support of her denial, Plaintiff cites Mr. Browne's assertion in an affidavit that "Magnano walked through the main passageway by her so we decided to move her." Dkt. No. 55 (Response) at ¶ 156. More likely, Mr. Browne was merely detailing his review of the layout of the office and was not remarking on an actual incident in which Mr. Magnano walked past Plaintiff. *See* Dkt. No. 53-10 at 4 ("Because the one specific area where she was located was the bottleneck, Mr. Magnano walked through the main passageway by her so we decided to move her. This was the best solution. He did telework quite a bit but we wanted to move the opportunity to interact with her."). Regardless, the building records suggest that they were never present at the same time. *See* Dkt. No. 52-8.

### III.    STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).  A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986).  "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at \*4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36–37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995) (citation omitted).  To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002).  A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp.

15

631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249–50).

## IV.    DISCUSSION

Plaintiff brings claims for both a hostile work environment and retaliation.  The Court addresses each in turn.

### A.  HOSTILE WORK ENVIRONMENT

First, the Court grants Defendant's motion for summary judgment in relation to Plaintiff's claim of a hostile work environment.  "To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that [her] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citation omitted).  Defendant's motion is premised on two arguments: 1) that Plaintiff cannot establish that the work environment was so severe or pervasive as to alter the terms and conditions of her employment, and 2) that there is no basis to impute liability to DFAS.  Dkt. No. 52-1 at 14-21.  In response, Plaintiff argues that Mr. Magnano's conduct altered her work environment because the conduct was unwelcome and largely took place during working hours, and that DFAS is liable because its response to Plaintiff's complaint was unreasonable and negligent.  Dkt. No. 56 at 8-16.

### I.  CONDITIONS OF EMPLOYMENT

First, in assessing hostile work environment claims, courts consider several factors including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993);

*see also Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015). A hostile work environment has both an objective and subjective component: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 320-21 (citation omitted).

First, a reasonable juror could find that Plaintiff was *objectively* subjected to a hostile work environment. Defendant argues "there is no evidence in the record that Magnano's interactions with Pachura altered the terms and conditions of her employment," chiefly because their communications took place almost exclusively on Facebook Messenger and on personal cell phones. Dkt. No. 52-2 at 15-16 (citing *Paola v. DeJoy*, 624 F. Supp. 3d 305, 319 (W.D.N.Y. 2022) and *Devlin v. Teachers' Ins. & Annuity Ass'n of Am.*, No. 02 Civ. 3228(JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003)).[11] However, a large portion of Plaintiff's messages with Mr. Magnano took place while she was on duty, necessarily impacting Plaintiff's experience in the

---

[11] Defendant's case law is distinguishable. In *Devlin v. Teachers' Ins.*, the court found that conduct which took place solely at an after-work celebration of another employee's promotion did not implicate the plaintiff's work environment. 2003 WL 1738969, at *2. Here, the conduct in question is not confined to an out-of-office location, and many of the messages took place during working hours. And in *Paola v. DeJoy*, the court took pains to recognize that out-of-work conduct *alone* is incapable of establishing a hostile work environment claim, but that out-of-work conduct can be considered "as part of the 'totality of the circumstances' when assessing a hostile work environment claim[.]" 624 F. Supp. 3d at 319. In finding no hostile work environment, the court noted that plaintiff acknowledged that the alleged harasser never bothered her at work. Here, that is not the case. On reply, Defendant cites to *Vito v. Bausch & Lomb Inc.*, 403 Fed. Appx. 593, 597 (2d Cir. 2010), and *Dole v. Town of Bethlehem*, 1:16-CV-0173 (DJS), 2017 WL 1483451, at *7-8 (N.D.N.Y. Apr. 25, 2017). In *Vito*, the Second Circuit held that a single incident of a supervisor accidentally touching a plaintiff's breast was insufficient to sustain a hostile work environment claim; here, Mr. Magnano's conduct was all intentional and persisted for months. 403 Fed. Appx. at 597. And in *Dole*, the complained of conduct "occurred over the span of approximately one week and consisted of five voicemails, approximately thirty text messages, and one Facebook post." 2017 WL 1483451, at *8. The messages here were greater in number and spanned a significant period of time.

office.  *See, e.g.*, Dkt. No. 52-2 at ¶ 32.  Moreover, as corroborated by an officemate of Plaintiff's, Mr. Magnano did in fact approach Plaintiff's desk on multiple occasions.  *Id.* at ¶ 84.  Even the communications that took place purely over Facebook Messenger involved Plaintiff's work environment, including Mr. Magnano's repeated desire to come by Plaintiff's desk to look at her legs and his proposition to look at her tattoos in a particular office in the building he described as a "private spot[.]"  *See, e.g, id.* at ¶¶ 41(s), 53; Dkt. No. 55 at ¶ 2(e); Dkt. No. 52-15 at GOV-001539.  Defendant also does not dispute that Mr. Magnano would sometimes message Plaintiff on her work computer.  Dkt. No. 55 at ¶ 3.  Given these undisputed facts, a reasonable juror could find that though Mr. Magnano's conduct largely took place over private messages, the conduct also permeated Plaintiff's work environment to a sufficient degree to establish a claim.  *See Parrish v. Sollecito*, 249 F. Supp. 2d 342, 351-52 (S.D.N.Y. 2002) ("the reach of the employment 'environment' should be viewed holistically.").

Defendant also notes that Plaintiff "does not allege that the alleged conduct interfered with her ability to perform the functions of her job," and therefore, cannot establish that Mr. Magnano's conduct altered the terms and conditions of her employment.  Dkt. No. 52-1 at 15-16 (citing *Stepheny v. Brooklyn Hebrew Sch.*, 356 F. Supp. 2d 248, 265 (E.D.N.Y. 2005)).  The Court need not determine if such allegations are necessary, rather than merely relevant to, a hostile work environment claim.  *Compare Stepheny*, 356 F. Supp. 2d at 265 (describing such allegations as the "*sine qua non*" of a hostile work environment claim) *with Harris*, 510 U.S. at 23 (listing "whether [the conduct] unreasonably interferes with an employee's work performance" as one of several factors to consider and explicitly stating "no single factor is required").  Here, a reasonable juror could find that Plaintiff suffered interference with her work performance.  Plaintiff testified in her deposition that she might have told Mr. Magnano she was having issues getting her work done and

18

that her work performance dipped during certain periods of her conversation with Mr. Magnano. Dkt. No. 53-1 at 80:15-82:12. Plaintiff also specifically alleged in her complaint, and continues to assert now, that her medical leave was caused by Mr. Magnano's conduct, though Defendant refutes that Plaintiff's contention is supported by any evidence beyond her own statements. Dkt. No. 22 at ¶ 17; Dkt. No. 59-1 (Response) at ¶ 15.

Beyond interference with her work, other factors suggest that there is an issue of fact as to whether Plaintiff faced an objectively hostile work environment. Mr. Magnano sent Plaintiff sexually charged messages almost every day, and thus, the alleged harassment was frequent. Mr. Magnano also sent an unsolicited picture of his genitals and visited Plaintiff's desk on several occasions, and thus, a reasonable juror could find Mr. Magnano's messages exceeded mere "utterances" and were sufficiently severe. *See, e.g.*, Dkt. No. 52-2 at ¶ 45; *contra Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002) (listing insufficiently severe scenarios). Therefore, the Court finds that there is a disputed issue of material fact as to whether Plaintiff objectively experienced a hostile work environment.

Next, Defendant contends that Plaintiff was "a willing participant in the relationship," and therefore, the alleged conduct was not so unwelcome as to satisfy the subjective component. Dkt. No. 52-1 at 15 (citing *Slinkosky v. Buffalo Sewer Authority*, No. 97-CV-0677E(SR), 2000 WL 914118, at *6 (W.D.N.Y. June 29, 2000)). Defendant correctly points out, and Plaintiff does not dispute, that Plaintiff sometimes engaged in flirtatious conversation with Mr. Magnano and did not ask to end their conversation prior to October 9, 2019. *Id.* However, the Court finds that there is a disputed issue of material fact as to Plaintiff's subjective feelings throughout her interactions with Mr. Magnano. After a close review of the messages between Mr. Magnano and Plaintiff, the Court finds that reasonable jurors could differ on their interpretation of the messages. Despite

19

continuing the conversation with Mr. Magnano, Plaintiff did inform him that she was not interested in anything more than conversation.  *See, e.g.,* Dkt. No. 55 at ¶ 11(h).  A reasonable juror could find that Mr. Magnano's persistent requests and innuendos violated Plaintiff's stated boundaries. Moreover, Plaintiff's neighbor in the office reported that Plaintiff told her that Mr. Magnano was "stalking her on Facebook and making her uncomfortable" during the course of their messages. Dkt. No. 52-2 at ¶ 87.  Finally, a reasonable juror could credit Plaintiff's testimony about her history of abuse and her tendency to make light of uncomfortable situations as a lens through which to read Plaintiff's participation in the messages.  Dkt. No. 55 at ¶ 8 (citing Dkt. No. 53-1 at 104). Such facts could convince a reasonable juror that Plaintiff *subjectively* experienced a hostile work environment despite her apparent willingness to engage with Mr. Magnano.[12]  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (stating that the "question [of] whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact").  Moreover, Plaintiff has testified that she kept responding to Mr. Magnano's messages in fear that she would be assaulted, in fear that he would come to her desk if she did not respond, and in fear that he would spread rumors.  Dkt. No. 55 at ¶ 9.  Such testimony, in conjunction with the other evidence listed above, is sufficient to create an issue of material fact as to whether the work environment was subjectively hostile.

The Court moves on to assess liability against the Defendant.

## II.  DFAS LIABILITY

After establishing a hostile work environment, a plaintiff asserting such a claim must point

---

[12] To the extent that Defendant argues that Plaintiff's apparent willingness to converse with Mr. Magnano indicates there was no "objective" hostile work environment, Dkt. No. 59 at 6-7, the argument fails for the same reasons.  A reasonable juror could find that though Plaintiff appeared as an active participant in the conversation at various points, Mr. Magnano's conduct exceeded Plaintiff's stated boundaries.

to a "specific basis" for "imputing the conduct [of Mr. Magnano] to the employer." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997). When the allegations of a hostile work environment involve a "mere co-worker," the employer is liable only if it "failed to provide a reasonable avenue for complaint[13] or [if] it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Bentley v. Autozoners, LLC*, 935 F.3d 76, 92 (2d Cir. 2019). In attempting to establish liability through the employer's knowledge, Plaintiff must demonstrate each of the following: "(1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Duch v. Jakubek*, 588 F.3d 757, 763 (2d. Cir. 2009). Defendant contends that DFAS had no knowledge of the alleged harassment, and that it took appropriate measures to stop future harassment as soon as Plaintiff reported it. Dkt. No. 52-1 at 17-21. The Court agrees and finds that Plaintiff has no specific basis to impute liability to Defendant, and therefore, grants summary judgment in relation to the hostile work environment claim.

The Court finds, as a matter of law, that Defendant had neither actual nor constructive knowledge of the alleged harassment before November 19, 2019. There is no dispute that Defendant did not have actual knowledge of Mr. Magnano's conduct prior to Plaintiff's report in November 2019, after the messages ended. Dkt. No. 52-2 at ¶ 73.[14] As to constructive knowledge, courts in this circuit have found constructive knowledge based on an assessment of various signs including whether a plaintiff requested changed working conditions, whether the employer knew

---

[13] The parties do not dispute that DFAS provided a reasonable avenue for complaint. *See* Dkt. No. 59 at 3.

[14] Plaintiff avers that Ms. Iselo was made aware that Plaintiff was receiving inappropriate comments about her legs, but Plaintiff does not dispute that no mention of Mr. Magnano was made. Dkt. No. 55 (Response) at ¶ 73.

the alleged harasser had engaged in misconduct in the past, and whether the employer had other reasons to suspect some form of misconduct.  *Duch*, 588 F.3d at 765 (2d Cir. 2009).  The bar for constructive knowledge is relatively high.  *See Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 250 (2d Cir. 1995) (finding no constructive notice where employer had notice of past misbehavior and where numerous dental students knew of the misconduct and openly teased the plaintiff about the misconduct); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 102-03 (2d Cir. 2011) (affirming summary judgment where plaintiff's complaints to supervisors were too generalized to imbue constructive knowledge).  Plaintiff points to no such factors in her opposition to summary judgment, and indeed, appears to concede that no liability may be found based on Defendant's conduct prior to November 19, 2019.  *See* Dkt. No. 56 at 13-14 (focusing on remedial action taken after November 19, 2019).[15]  Regardless, DFAS management could not have been aware of the private messages between Plaintiff and Mr. Magnano, nor were their limited interactions in the office concerning enough to raise a red flag with Plaintiff's neighbor in the

---

[15] In her Amended Complaint, Plaintiff asserts Defendant should have known about the harassment because 1) Ms. Szarek previously had a separate sexual harassment issue, 2) DFAS knew of Mr. Magnano's relationship, 3) Plaintiff told Ms. Iselo in August 2019 that she was receiving inappropriate comments on her clothing, 4) Mr. Magnano "admitted" to harassing another employee named Crystal and Ms. Iselo was skeptical of his intentions with her, and 5) a Regional Union Representative stated that sexual harassment was a problem at Mr. Magnano's local office. Dkt. No. 22 at ¶ 14.  To the extent these arguments have not been abandoned, they are baseless. None pertain to Mr. Magnano's alleged harassment of Plaintiff specifically beyond Plaintiff's August 2019 comment to Ms. Iselo, and again, Plaintiff did not provide Ms. Iselo with any specifics at that time which could possibly give reason to suspect Mr. Magnano of misconduct in violation of Title VII.  Moreover, at her deposition, Plaintiff revealed that Mr. Magnano never admitted to harassing an employee named Crystal, but instead merely identified her in response to Plaintiff questioning whether he had any other "female great friends" at the office.  Dkt. No. 52-12 at 140-41.  Even if Ms. Iselo was skeptical about Mr. Magnano's relationship with another employee, mere skepticism without knowledge of an actual complaint against Mr. Magnano is far from sufficient to establish constructive knowledge of Mr. Magnano's propensity to harass, let alone to establish constructive knowledge of Mr. Magnano's specific alleged harassment of Plaintiff.

office, let alone management overseeing approximately 1,100 employees. Dkt. No. 52-2 at ¶¶ 7, 26-27, 33-34, 82-87. As such, DFAS was not on constructive notice of the alleged harassment prior to November 19, 2019.

However, DFAS did have actual knowledge at all points after November 19, 2019. Therefore, DFAS was under an obligation to take "appropriate remedial action" after Plaintiff reported Mr. Magnano's behavior. *Bentley*, 935 F.3d at 92. As this Court noted in its decision at the motion to dismiss stage, that Mr. Magnano ceased messaging Plaintiff prior to Plaintiff's report does not relieve Defendant of the obligation to respond appropriately. Dkt. No. 33 at 15 (distinguishing *Beattie v. Farnsworth Middle School*, 143 F. Supp. 2d 220 (N.D.N.Y. 1998)). If it is unclear whether the harassment of a plaintiff might resume, a defendant is obligated to act reasonably to prevent further harassment. *Id.* The standard for determining appropriate remedial action is "essentially a negligence one." *Summa v. Hofstra University*, 708 F.3d 115, 125 (2d Cir. 2013). In determining whether Defendant acted negligently in its response, the Court looks to the "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998). Here, even assuming there was a risk of continued harassment,[16] Defendant responded appropriately.

---

[16] As Plaintiff points out, at least one factor indicates there was some risk of continued harassment. Though Mr. Magnano ceased messaging Plaintiff on October 9, 2019, Plaintiff took a medical leave of absence just a few days later. Thus, there was at least some risk that the communications would begin again upon Plaintiff's return to the office. However, Plaintiff's argument that Mr. Magnano had previously ignored Plaintiff's attempts to end the conversation, an argument this Court initially took at face value at the motion to dismiss stage, now rings hollow. *See* Dkt. No. 33 at 15. A thorough review of the messages reveals that Plaintiff did not ask Defendant directly to cease contact with her prior to October 9, 2019. Dkt. No. 56 at 14. And Plaintiff points to no requests outside of the messages. Thus, it is a closer call whether there was reason to think the alleged harassment might continue, and therefore, whether any action at all was required. *See Beattie*, 143 F. Supp. 2d at 229.

The undisputed facts demonstrate that DFAS acted both to investigate the allegations and eliminate the risk of future harassment promptly and effectively in light of the circumstances. S*ee, e.g., Ball v. Marriott Int'l, Inc.*, 627 F. Supp. 3d 296, 317-21 (S.D.N.Y. 2022) (dismissing claim where evidence showed that the employer took prompt and reasonable measures to investigate and prevent future harassment). DFAS initiated its management inquiry into Mr. Magnano's conduct within a day of Plaintiff's first report. Dkt. No. 52-2 at ¶¶ 70-74. Within three weeks of the report, the management inquiry lead, Ms. Iselo, interviewed all relevant parties, obtained and reviewed the messages between Plaintiff and Mr. Magnano, and crucially, issued No Contact orders to both Plaintiff and Mr. Magnano. *Id.* at ¶¶ 75-92. Eventually, despite a finding that no harassing conduct occurred, Mr. Magnano received a seven-day suspension without pay. *Id.* at ¶ 101. Under similar circumstances, courts in this circuit have found that the mere initiation of an investigation of a plaintiff's allegations is enough to avoid liability, even without punishment of the alleged offender. *See Zaja v. SUNY Upstate Medical Univ.*, 5:20-CV-337 (MAD/TWD), 2022 WL 4465498, at *4-6 (N.D.N.Y. Sep. 26, 2022) (granting summary judgment where employer's sole response was to immediately initiate an investigation into the allegations); *Gary L. v. CSX Transp., Inc.*, 6:18-CV-808 (MAD/ATB), 2020 WL 6343289, at *7-8 (N.D.N.Y. Oct. 29, 2020) (finding opening an investigation to be sufficient where allegations of harassment were determined to be unfounded). Therefore, Defendant's response was not negligent, and Plaintiff may not impute liability to her employer on the hostile work environment claim.

Plaintiff first takes issue with the seven-day suspension of Mr. Magnano. Dkt. No. 56 at 15. However, "there is no requirement that the remedy include punishing the co-worker responsible for the [alleged] sexual harassment," and instead, the law "simply requires that the remedial action taken be reasonably calculated to end the sexual harassment." *Cowan v. City of*

*Mount Vernon*, No. 14-CV-8871, 2017 WL 1169667, at *6 (S.D.N.Y. Mar. 28, 2017) (citation omitted); *see also Chenette v. Kenneth Cole Prods.*, 05cv4849(DLC), 2008 WL 3176088, at *11 (S.D.N.Y. Aug. 6, 2008) (there is "no legal requirement that an employer discipline employees where it succeeds in eradicating the offensive behavior from the workplace by other means."). Here, it is undisputed that Mr. Magnano never communicated with Plaintiff after October 9, 2019, and Defendant's steps, including the No Contact orders, were reasonably calculated to ensure that remained the case. Therefore, that Mr. Magnano was "only suspended for seven days" cannot justify imputing liability to DFAS. Dkt. No. 56 at 15.

Plaintiff also takes issue with the length of time between Plaintiff's November 19, 2019 complaint and the completion of the investigation over four months later. Dkt. No. 56 at 15. But Plaintiff ignores the crucial intermediary steps taken by Defendant to eliminate the possibility of harassment in the meantime, including the No Contact orders and immediately initiating an investigation into the allegations. These steps were more than sufficient under the circumstances, as evidenced by the fact that Mr. Magnano did not reach out to Plaintiff again after she asked to end the conversation on October 9, 2019. The law does not require employers to complete investigations into allegations of harassment within a brief window. Instead, it merely demands that the employer take some immediate and reasonable action to prevent the possibility of further harassment. *See Martin v. N.Y.*, 17cv9721 (DLC), 2019 WL 2053992, at *3-5 (S.D.N.Y. May 9, 2019) (finding a sufficient response where removal action wasn't taken against the harasser until eight months later but the defendant immediately instigated an investigation and directed the harasser to cease and desist from any harassing behavior). Defendant has satisfied this obligation. Plaintiff's sole case, *Kracunas v. Iona College*, deals with an entirely different set of circumstances. 119 F.3d 80 (2d Cir. 1997). There, the defendant took no action whatsoever for

approximately four to six months. *Id.* at 90. In contrast, DFAS initiated an investigation immediately and directed No Contact Orders within weeks. Thus, *Kracunas* does not save Plaintiff's claim.

Finally, Plaintiff takes issue with her relocation closer to Mr. Magnano in February 2020. Dkt. No. 56 at 15-16, but there is no question that the other actions taken by Defendant, including its investigation and the No Contact orders, were "effective" at preventing further harassment, the central concern for assessing the reasonableness of the Defendant's response. *See Ferrando-Dehtiar v. Anesthesia Group of Albany, P.C.*, 727 F. Supp. 3d 165, 188 (N.D.N.Y. 2024) (granting summary judgment where Defendant conducted investigations and "the offensive conduct in the workplace ceased"). Even putting aside Defendant's other reasonable actions, it is undisputed that when Plaintiff informed her supervisor and the EEO of her proximity to Mr. Magnano's cubicle, Defendant acted promptly, at least internally, to remedy the situation. Dkt. No. 52-2 at ¶¶ 141-43, 147-48, 153. Even crediting Plaintiff's testimony that her desk was never moved over the evidence which suggests that Plaintiff was in fact moved, the allegations do not demonstrate an unreasonable response for several reasons. First, it was eminently reasonable for Defendant to move Plaintiff to the East Wing location of her new team in the Accounting Directorate. Second, Plaintiff only visited the office a few times prior to converting to fully-remote work due to the COVID-19 pandemic. *Id.* at ¶¶ 154-58. Thus, even under Plaintiff's version of events, Defendant had only a short amount of time to move Plaintiff's cubicle. Third, the record evidence indicates that Plaintiff and Mr. Magnano were never in the office at the same time after her move to the Accounting Directorate, and even if they were, the two remained under the No Contact orders. *Id.* at ¶ 156. Finally, Defendant's overall response must be evaluated in light of the fact that the harassment

26

ceased prior to Plaintiff's complaint[17] and the overall severity of Mr. Magnano's conduct.  At the time of the transfer, Mr. Magnano had honored Plaintiff's request to end their conversation.  Dkt. No. 52-2 at ¶ 60.  Moreover, the investigation revealed that one of Plaintiff's officemates at the time never witnessed any inappropriate conduct in the office.  *Id.* at ¶ 86.[18]   In light of these considerations, Defendant's response was prompt, extensive, and effective.  *See Oliver v. New York State Police*, 1:15-cv-00444 (BKS/DJS), 2020 WL 1989180, at *31 (N.D.N.Y. Apr. 27, 2020) (dismissing claim despite placement of plaintiff on the same team as the alleged harasser after plaintiff made her complaint where there was no evidence of continued harassment and defendant took immediate steps to remedy the situation).

Therefore, the Court dismisses the hostile work environment claim.[19]

### B.  RETALIATION

Second, the Court grants Defendant's motion for summary judgment in relation to Plaintiff's retaliation claims.  Such claims must be evaluated under the *McDonnell Douglas* burden-shifting approach.  *Kirkland-Hudson v. Mount Vernon City School District*, 665 F. Supp. 3d 412, 458 (S.D.N.Y. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

---

[17] Though the fact that harassing conduct has ceased does not preclude a finding of employer liability for a hostile work environment, Defendant's response still must be evaluated in light of the circumstances, including the demonstrated risk of continued harassment.  Dkt. No. 33 at 15.

[18] Plaintiff's relocation was also, at least in part, in response to Plaintiff's express interest in moving to a position with Accounting.  Dkt. No. 52-2 at ¶¶ 124, 127, 131.

[19] Plaintiff's additional citations are unavailing.  In *Whidbee v. Garzarelli Food Specialities, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000), the Court found an issue of fact as to the reasonableness of the employer's response because there was conflicting evidence on whether the employer initially failed to take action and because the alleged harasser's conduct had not ceased.  Here, there is no dispute that DFAS immediately began an investigation into Plaintiff's allegations and that the conduct had stopped.  And in *Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir. 1998), the court did not grant summary judgment because there was an issue of fact as to whether the plaintiff insisted that the employer refrain from taking action in response to her complaint and whether any action at all was taken to remedy the potential for harassment.  Neither question exists here.

First, Plaintiff must establish a *prima facie* case of retaliation by showing the following elements: "(1) she was engaged in protected activity; (2) the employer was aware of the activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012) (citations omitted). Second, once Plaintiff has made her *prima facie* case, the burden shifts to Defendant to articulate a non-retaliatory reason for the alleged actions taken against Plaintiff. *Mitchell v. State Univ. of New York Upstate Med. Univ.*, 723 Fed. Appx. 62, 63 (2d Cir. 2018) (summary order). Third, "[i]f the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is pretext for . . . retaliation." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (per curiam).[20]

Plaintiff points to the initial denial of her job application for a position within the Accounting Directorate in favor of Ms. Hammond, the possible continued refusal to hire Plaintiff for other open positions, and her later transfer to accounting as instances of retaliation. The Court addresses each alleged instance of retaliation in turn.

## I. DENIAL IN FAVOR OF MS. HAMMOND

First, Plaintiff argues the denial of her application for the 7/9/11 Accountant position in favor of Ms. Hammond was retaliation for complaining about the alleged harassment. However, Plaintiff cannot satisfy her burden to establish a *prima facie* case for such a claim.

---

[20] Typically, to meet that burden, the Plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 835 (2d Cir. 2013)). However, in *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), the Supreme Court held, in an ADEA action, that but-for causation is not needed to make out a retaliation claim against federal employers. The Second Circuit has yet to decide whether the holding in *Babb* applies outside of the ADEA context, and this Court need not resolve whether but-for causation is needed in the Title VII context against federal employers because Plaintiff's claims fail under any standard. *See Hale v. Vidal*, 22-2973, 2023 WL 7211909, at *1 (2d Cir. Nov. 2, 2023) (summary order).

Plaintiff cannot demonstrate the fourth element, a "causal connection" between the failure to hire Plaintiff for the position and the protected conduct, because the undisputed record evidence demonstrates that the hiring decision-makers were unaware of Plaintiff's complaint. Plaintiff concedes that Ms. Szarek and Mr. Ferguson, the two individuals charged with hiring for the position, did not know that Plaintiff had made allegations against Mr. Magnano at the time they hired Ms. Hammond for the position instead of Plaintiff. Dkt. No. 52-2 at ¶¶ 116, 118. To satisfy the fourth element in the absence of evidence of actual knowledge by a decision-maker, Plaintiff must show "that the individual who carried out the adverse action did so pursuant to explicit or implicit orders of or encouragement by a superior who did possess knowledge of the protected activity." *Diaz v. City Univ. of N.Y.*, No. 13 Civ.2038(PAC)(MHD), 2015 WL 5577905, at *8 (S.D.N.Y. Sep. 22, 2015). There is no evidence in the record that either Ms. Szarek or Mr. Ferguson were encouraged by anyone, let alone a superior with knowledge of Plaintiff's allegations, to choose another candidate. Therefore, Plaintiff has failed to establish a *prima facie* case of retaliation at this stage. *See also Seivright v. Montefiore Med. Ctr., Hosp. of Albert Einstein Coll. of Med.*, No. 11 Civ. 8934(AJN), 2014 WL 896744, at *12 (S.D.N.Y. Mar. 3, 2014) ("[W]here the individual decision-maker lack[s] knowledge of the protected activity, there must be evidence that the decision-maker was at least influenced or encouraged to take the adverse action by a superior with knowledge of the protected activity.").

Plaintiff's invocation of the general corporate knowledge doctrine and temporal proximity do not save her *prima facie* case. First, though general corporate knowledge is sufficient to establish the second element of the *prima facie* case, Plaintiff "cannot rely on general corporate knowledge alone to satisfy the . . . 'causal connection' prong[.]" *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 34 (E.D.N.Y. 2015) (citations omitted). Second, though temporal proximity is often

sufficient to establish a "causal connection" at the *prima facie* stage, and though there is no bright line for the required proximity, "[w]here, as here, a plaintiff relies *exclusively* on timing to [establish] causation, the temporal proximity between the protective activity and adverse employment action must be 'very close.'" *Ehrbar*, 131 F. Supp. at 34 (citation omitted) (emphasis added). In these circumstances, "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Serv's of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (listing cases).[21] Also, where timing is the sole indicator of causation, "the facts and circumstances of a given case become more relevant." *Ehrbar*, 131 F. Supp. at 34. Here, approximately two months passed between Plaintiff's initial complaint and the decision to hire another candidate for the position. Dkt. No. 52-2 at ¶ 120. Around the same time, Defendant proactively began preparing to offer Plaintiff a position with the Accounting Directorate after her graduation, strongly indicating that the denial of her job application was not connected to her harassment allegations. *Id.* at ¶ 127. Defendant ultimately offered Plaintiff a position just a few months later, and Plaintiff accepted. Finally, undisputed evidence demonstrates that the relevant decision-makers were unaware of the complaints at the time the hiring decision was made. *See Seivright*, 2014 WL 896744, at *12; *see also Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (finding evidence of the lack of knowledge of the decision-makers to be evidence capable of countering plaintiff's "circumstantial evidence of proximity" for purposes of

---

[21] That the parties have conducted discovery and reached the summary judgment stage further supports a finding that the temporal proximity here is insufficient to carry the *prima face* case. *See Walters v. MedBest Medical Management, Inc.*, No. 5:14-CV-0572 (LEK/ATB), 2015 WL 860759, at *9 (N.D.N.Y. Feb. 27, 2015) (distinguishing the defendant's cases on grounds that they all "addressed motions for summary judgment, where discovery had been conducted and the courts could weigh relevant circumstances along with the temporal proximity.").

the *prima facie* case).  Given the lack of other evidence suggesting causation, the borderline temporal gap between the complaint and the hiring decision, and the countervailing circumstantial evidence, the Court finds the Plaintiff has not established a causal connection sufficient to carry her *prima facie* case.

Regardless of whether Plaintiff satisfied her *prima facie* case, Plaintiff has also failed to carry her burden at the third step of the *McDonnell Douglas* framework to show that Defendant's articulated explanation is pretext.  Defendant puts forward that it had "legitimate non-retaliatory reasons for their actions[:]" namely, that budgetary constraints encouraged Defendant to choose an applicant at the GS-7 paygrade, and that because Plaintiff did not apply at that paygrade, she was not chosen.  Dkt. No. 52-1 at 24.  The successful candidate did apply at the GS-7 paygrade, obtained the highest interview score amongst the candidates that did so, and was performing well as a current employee in the Accounting Directorate.  *Id.*  Plaintiff's attempts to demonstrate this explanation is pretextual are baseless.

First, Plaintiff points to Mr. Ferguson's EEO Affidavit to imply pretext, but Plaintiff's reading of the affidavit eschews reality.  Dkt. No. 56 at 27 (citing Dkt. No. 52-5).  Plaintiff asserts that Mr. Ferguson's statement that "if there was not a good candidate at the GS-7 level they would select from the GS-9 level regardless of the budget" indicates there was no real budgetary constraint on the hiring position.  *Id.*  Not so.  An employer can prioritize budgetary constraints while leaving open the possibility of expending greater resources should it become necessary to do so.  Here, Mr. Ferguson affirmatively stated that because Defendant "did have at least one viable candidate at the GS-7 level" there was no need to select a candidate from the GS-9 level.  Dkt. No. 52-5 at 6-7.  Therefore, Defendant's rationale is entirely coherent and consistent.

Beyond Plaintiff's arguments, no reasonable juror could find pretext in Defendant's

articulated explanation because, again, Defendant did in fact hire Plaintiff for a GS-7 position in the Accounting Directorate mere months after her initial application.  Dkt. No. 52-2 at ¶ 131.  If Defendant's budgetary rationale were pretext for retaliation, Defendant's near immediate decision to set in motion a plan to hire Plaintiff for a permanent position in the Accounting Directorate after her graduation would seem to entirely contradict that act of retaliation.  As a result, Plaintiff has failed to carry her burden to suggest that Defendant's articulated rationale for failing to hire her for the Accounting Directorate position is pretext.  Therefore, the retaliation claim is dismissed to the extent it relies on the hiring of Ms. Hammond instead of Plaintiff.

## II.  SPECULATIVE ADDITIONAL DENIALS

Plaintiff also asserts that she remained a job candidate after the initial position was filled because the job posting detailed multiple openings, and that the continued refusal to hire her for those other openings constitutes retaliation.  Dkt. No. 56 at 22-23.  Importantly, according to Plaintiff, the continued refusal to hire Plaintiff for these other openings occurred, at least in part, after the relevant actors became aware of her allegations, thus negating the causal connection deficiencies related to the decision to choose Ms. Hammond.  *Id.*  Plaintiff's claim fails on multiple levels.

First, Plaintiff has failed to establish the third prong of the *prima facie* case, an actual adverse employment action, in relation to the speculative openings.  The only hiring decision that is evidenced at any point in the record is the decision to hire Ms. Hammond over Plaintiff.  Plaintiff bases her position that other, identical vacancies existed on two pieces of evidence.  First, Plaintiff points out that the specific listing to which she applied on the relevant application website referenced "many vacancies" at all the listed locations, including three locations to which Plaintiff did not apply.  *See* Dkt. 53-21 at 1-2.  Second, Plaintiff points to her interpretation of phone calls

with Ms. Szarek on February 13, 2020 and March 6, 2020, during which Plaintiff avers Ms. Szarek said "she was going to hire [Plaintiff] . . . when she received budgetary authority" and that the GS-9 list which Plaintiff appeared on would be "open for another month for her to pick from." Dkt. No. 55 at ¶¶ 39-42; Dkt. No. 53-14 at 14.

These arguments are insufficiently supported. The vague listing of "many vacancies" on the job application website is a mere "scintilla of evidence," and is incapable of avoiding summary judgment in the face of the contradicting record evidence. *Transflo Terminal Serv's Inc. v. Brooklyn Resource Recovery, Inc.*, 248 F. Supp. 3d 397, 399 (E.D.N.Y. 2017). Both Ms. Szarek and Mr. Ferguson have testified that there was only one relevant position to be filled in Rome, and Ms. Szarek asserts that Plaintiff misunderstood their conversations on February 13 and March 6, 2020. *See* Dkt. No. 52-5 at 7; Dkt. No. 52-4 at 1-2, 5-9. Even crediting Plaintiff's interpretation of her phone calls with Ms. Szarek as true and assuming that Ms. Szarek was planning on hiring Plaintiff once she had budgetary authority and that Plaintiff remained on a hiring list, Plaintiff's allegations do not equate to Plaintiff being refused an actual available position. Plaintiff fails to point to any evidence, whatsoever, that other positions were ever filled. *See* Dkt. No. 55 (Response) at ¶ 45 (acknowledging there is no evidence in the record that the alleged other positions were ever filled). At most, Plaintiff has provided evidence that her name remained on a hiring list after her application was denied. Such facts are insufficient to establish an adverse employment action under Title VII, which requires a showing that the action could "dissuade a reasonable worker" from reporting allegations of harassment. *See Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 91 (2d Cir. 2015).

Even if Plaintiff had created an issue of fact as to her *prima facie* case, Plaintiff still fails to carry her burden to demonstrate pretext in relation to the purported other openings. Plaintiff

fails to explain how Defendant's articulated explanation for why Plaintiff was not hired in the first instance would not similarly apply to the refusal to hire Plaintiff for the other positions. It remains the case that Plaintiff applied at the GS-9 paygrade and that Defendant prioritized budgetary constraints. Indeed, Plaintiff's recollection of her calls with Ms. Szarek further supports Defendant's stated rationale. Dkt. No. 53-14 at 14 (Plaintiff noting Ms. Szarek mentioned budgetary constraints). Moreover, given the absence of any evidence whatsoever that other positions were, in fact, filled by candidates, Plaintiff cannot demonstrate that the ultimately successful candidates' credentials were so inferior as to justify hiring a candidate from the higher paygrade. Therefore, Plaintiff's claim of retaliation related to other purported openings fail as a matter of law.

### III.  CUBICLE RELOCATION

Finally, Plaintiff makes a claim of retaliation in connection with her cubicle relocation. Regardless of whether Plaintiff has established a *prima facie* case of retaliation in relation to the cubicle reassignment, Plaintiff certainly has not carried her burden to show that Defendant's articulated explanation for the cubicle relocation is pretext.[22] Defendant avers that Plaintiff was

---

[22] In addressing pretext first, the Court need not determine whether Plaintiff has made a *prima facie* case. But given the circumstances, the Court finds in the alternative that Plaintiff has failed to establish an adverse employment action. *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) ("the standard is phrased in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."). Though moving employees closer to their harassers may sometimes be considered an adverse employment action, *see Echevarria v. Utitec, Inc.*, 3:15-cv-1840 (VLB), 2017 WL 4316390, at *10 (D. Conn. Sept. 29, 2017), the circumstances here do not justify such a finding. Contrary to *Echevarria*, Plaintiff's allegations of harassment do not involve physical harassment in the office. Moreover, when the plaintiff in *Echevarria* complained of her location, her employer only offered to switch her to a new job altogether, which may or may not have been equivalent. Here, Defendant acted immediately to keep Plaintiff in her preferred job while also directing her move to a new cubicle location. No reasonable worker would be dissuaded from filing allegations of harassment due to Defendant's conduct. *See Vega*, 801 F.3d at 90. Plaintiff was given a preferred job, put on track to be given a permanent position after her graduation, and was met with

placed in her cubicle because the cubicle was located in the location of her new team, the Accounting Directorate, a team which Plaintiff wished to join. Dkt. No. 52-1 at 25. Defendant also avers that cubicle space was limited and several DFAS teams were displaced due to renovations, leading to Plaintiff's placement at her particular cubicle. *Id.* at 12.

Despite suggesting this explanation is pretext, Plaintiff provides no evidence of "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's stated rationale. *See Kwan*, 737 F.3d at 846. Indeed, Defendant's rationale is supported at many points in the evidence, including Ms. Iselo's stated intention to move Plaintiff to Accounting in August 2019, months before Plaintiff made her allegations. *See* Dkt. 52-3 at 43. Instead, Plaintiff relies entirely on Ms. Iselo's failure to inform Plaintiff's new supervisors of her allegations. Dkt. No. 56 at 26-27. But Plaintiff points to no evidence whatsoever that Ms. Iselo knew of Mr. Magnano's cubicle location.[23] Therefore, Plaintiff's sole "evidence" in support of a finding of pretext is speculative. More importantly, as Plaintiff concedes, Defendant did in fact respond immediately to Plaintiff's complaint about her new location. Dkt. No. 52-2 at ¶¶ 144-151, 153. Ms. Szarek began looking for a new cubicle, *id.* at ¶ 143, and testified to the fact that "on the days that [Plaintiff] was in [the office] she was either sitting with someone else training or we would put her in a cube that an employee was not in that was not on the end of a row," Dkt. No. 52-29 at 106:22-107:3.[24] On the

---

a willingness to help when she raised her complaints about her cubicle. Plaintiff also never actually saw Mr. Magnano after her reassignment to the Accounting Directorate and was only briefly placed at the cubicle in dispute prior to beginning remote work. Dkt. No. 55 at 47.

[23] Plaintiff tries to establish Ms. Iselo's knowledge of Mr. Magnano's location by citing Dkt. 53-10 at 3. *See* Dkt. No. 55 at ¶ 22. But the cited portion of Ms. Iselo's EEO affidavit refers only to her role in overseeing Plaintiff's transfer. It does not establish any knowledge whatsoever of Mr. Magnano's desk location.

[24] Though Plaintiff has testified that her desk was never moved, *see* Dkt. No. 55 (Response) at ¶ 152, Plaintiff failed to respond to Defendant's statement of material fact regarding Plaintiff's placement at empty cubicles until a permanent move could be accommodated. *Id.* (Response) at

same day as Plaintiff's complaint, the Deputy Director of DFAS Rome instructed Mr. Ferguson to coordinate a relocation to a new area.  Dkt. No. 52-2 at ¶ 148.  These undisputed facts provide convincing evidence that Defendant's rationale is not pretext, and that retaliation was not a factor in the assignment of Plaintiff's cubicle.  To find otherwise, a jury would have to find that Defendant was both motivated in part by retaliation in Plaintiff's initial cubicle assignment and was willing to change Plaintiff's cubicle assignment immediately.  Such a finding would defy reason, and thus, the Court grants summary judgment in relation to the cubicle relocation.

## V.    CONCLUSION

**ORDERS** that Defendant's motion for summary judgment, Dkt. No. 52, is **GRANTED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules, and close the case.

**IT IS SO ORDERED.**

Dated: <u>February 3, 2025</u>
      Albany, NY

Anne M. Nardacci
U.S. District Judge

---

¶ 153.  Nor does Plaintiff's testimony directly contradict the statement.  *See generally* Dkt. No. 53-1 at 153-154.